[Nos. B052163, B054005. Second Dist., Div. Five. Aug. 31, 1992.]

IRA JACOVES et al., Plaintiffs and Appellants, v.
UNITED MERCHANDISING CORPORATION et al., Defendants and
Respondents.

**COUNSEL**

David M. Harney, Thomas Kallay, Stuart B. Esner and Grant Marylander for Plaintiffs and Appellants.

Fonda & Garrard, Peter M. Fonda, Greines, Martin, Stein & Richland, Kent L. Richland, Feris M. Greenberger, Roxanne Huddleston, Stone & Hiles and Laurie Rittenberg for Defendants and Respondents.

**OPINION**

**GRIGNON, J.**—This case arises from the suicide death of 20-year-old Jonathan Jacoves. Jonathan is survived by his parents Ira and Jeanne Jacoves, who are plaintiffs and appellants in this action. The Jacoveses appeal

from a summary judgment in favor of defendant and respondent Van Nuys Hospital (the Hospital). In their action against the Hospital for wrongful death and negligent infliction of emotional distress, the Jacoveses alleged that the Hospital, through its agents and employees, negligently cared for, treated and discharged Jonathan. We reverse the summary judgment in favor of the Hospital. The Jacoveses also appeal from a judgment on the pleadings in favor of defendant and respondent United Merchandising Corporation doing business as Big 5 Sporting Goods (Big 5). In their action against Big 5 for wrongful death and negligent infliction of emotional distress, the Jacoveses alleged that Big 5 negligently sold Jonathan the rifle with which he committed suicide. We affirm the judgment on the pleadings in favor of Big 5.

## PROCEDURAL BACKGROUND

The Jacoveses filed a first amended complaint against the Hospital, Big 5 and others who are not parties to this appeal for wrongful death and negligent infliction of emotional distress. The Hospital demurred to the complaint, asserting that the Jacoveses failed to state a cause of action against it for negligent infliction of emotional distress because it owed no duty to the Jacoveses. The trial court overruled the demurrer. The Hospital petitioned this court for a writ of mandate, requesting that the order overruling the demurrer be vacated. The petition was granted and the order overruling the demurrer was vacated by Division One of this court. The trial court was ordered to sustain the demurrer with leave to amend. (*Van Nuys Psychiatric Hospital v. Superior Court* (June 29, 1987) B026202 [nonpub. opn.].) The Jacoveses filed a second amended complaint. The Hospital answered the complaint.

Big 5 filed a motion for judgment on the pleadings which was granted. The Jacoveses' complaint against Big 5 was dismissed in its entirety with prejudice. The Jacoveses appeal from the judgment on the pleadings.

The Hospital filed a motion for summary judgment or, in the alternative, summary adjudication of issues. The motion for summary judgment was granted and the alternative motion for summary adjudication of issues was denied. The Jacoveses appeal from the summary judgment.

On our own motion, we have consolidated the appeal from the judgment on the pleadings (B052163) and the appeal from the summary judgment (B054005).

DISCUSSION

I

THE HOSPITAL'S MOTION FOR SUMMARY JUDGMENT

A. *The Allegations of the Second Amended Complaint*

On March 26, 1985, Jonathan tried to commit suicide by overdosing on nonprescription medication.[1] Jonathan was admitted to the Beverly Hills Medical Center,[2] where he was diagnosed as actively suicidal and schizophrenic. Two days later, on March 28, 1985, Jonathan was discharged from the Beverly Hills Medical Center on condition that the Jacoveses transfer him to a psychiatric facility. The treating psychologist recommended that Jonathan be admitted to the Hospital under the care of Lee Bloom, M.D., a psychiatrist, and the Jacoveses agreed.

On the same day he was discharged from the Beverly Hills Medical Center, the Jacoveses, Jonathan's sole providers of support, care and treatment, contracted with the Hospital for Jonathan to become a psychiatric patient under Dr. Bloom's care. The Jacoveses and Jonathan were required by the Hospital to sign a contract of admission which consisted of two forms: (1) the "Van Nuys Psychiatric Hospital Request for Voluntary Admission and Authorization for Treatment" (the Request for Admission) signed on March 28, 1985, by Jonathan as "Patient," Jeanne Jacoves as "Responsible Relative" and Dr. Bloom as the certified attending physician;[3] and (2) a "Van Nuys Psychiatric Hospital Conditions of Admission" signed on March 28, 1985, by Jonathan as "Patient" and Ira Jacoves as the "Financially Responsible Party (Insurance Policyholder)." Neither form specified that Jonathan would be admitted into any particular unit of the Hospital.

The Hospital's Request for Admission form released both the Hospital and Dr. Bloom from liability for possible injury to Jonathan which might result

---

[1]At this time, Jonathan was under the care of Michael Peck, Ph.D., a psychologist. Dr. Peck was not a defendant in this action and is not a respondent on appeal.

[2]Jonathan had been previously hospitalized at Coldwater Canyon Hospital from January 16 to 31, 1985, for major depression.

[3]The Request for Admission form provided that Jonathan consented to Dr. Bloom's care and treatment, agreed to follow "all rules and regulations" of the Hospital, acknowledged that the Hospital was a locked-door facility, agreed to give notice to a Hospital staff member and complete all normal hospitalization departure procedures if he wished to leave and released the Hospital, its agents and employees, as well as the attending physician, from any and all responsibility for injury and "possible self-injury" incurred as a result of any freedom of action allowed by the attending physician at the Hospital. The "authorizations and understandings [had] the concurrence of [Jonathan's] parents or conservators who also sign[ed] . . . below."

from his freedom of action while in the Hospital. The Hospital's Conditions of Admission form contained a release of both the Hospital and Dr. Bloom from liability for injuries to Jonathan resulting from any approved off-ground privileges. It also contained a grant of permission for the Hospital to perform all services and treatments prescribed by Dr. Bloom and a provision that "additional charges will be billed separately by [Dr. Bloom]."

Although there was a provision for the signature of the "Patient's Agent or Representative" on the Conditions of Admission form, neither of the Jacoveses signed the document in that capacity. Jonathan signed both forms "as patient and the party to be admitted as a condition of admission, and in order to evidence the fact that he was of legal age, and was aware of his admission to, and treatment by, [the Hospital]." The Jacoveses participated in the admission process, consented to and authorized Jonathan's admission and were the direct and intended beneficiaries of the contract, "authorizing and consenting to said treatment in order to implicate their own parental interests, abate their concerns, and to promote their own well-being, as well as that of their son."

Jonathan was diagnosed as having a "major depressive disorder, recurrent in a schizoid paranoid personality with suicidal potential and ideation." The Jacoveses were active instrumentalities in the treatment of Jonathan. They participated in group therapy with Jonathan and were intended to personally benefit from their participation. They received information concerning Jonathan's treatment and status "to ensure their contemporaneous awareness and ongoing treatment of [Jonathan]." On April 9, 1985, at the direction and request of Dr. Bloom, the Jacoveses entered into a contract with Jonathan, "in which he promised not to fulfill his suicide threats and attempts; . . . [the] agreement was entered into as part of [Jonathan's] treatment for the express and intended benefit of the [Jacoveses]."[4] Jonathan agreed to formally contract with his parents not to harm himself for four months upon discharge from the Hospital to his parents' home.

On April 11, 1985, 15 days after he was admitted, Jonathan was discharged from the Hospital based in part on his agreement with the Jacoveses that he would not commit suicide. Shortly before he was discharged, Jonathan told Penny Biroc, a Hospital psychiatric aide, he had agreed to contract with his parents not to commit suicide, and he hoped he meant it,

---

[4]The contract was entitled, "Contract between Jonathan Jacoves and Ira and Jeanne Jacoves." It set forth an agreement signed by the Jacoveses and Jonathan, in which the Jacoveses stated they wanted Jonathan living at home and Jonathan stated he wanted to live at home. Jonathan promised not to commit or try to commit suicide for the next four months, to abstain from the use of drugs and alcohol, to attend therapy and to take certain steps if he felt suicidal.

but doubted it. Biroc recorded that conversation in Jonathan's chart but did not inform Jeanne Jacoves of the statement when Biroc delivered Jonathan to her. Dr. Bloom negligently discharged Jonathan, in view of the recorded statement in Jonathan's medical chart that Jonathan's thoughts were still suicidal.

Subsequent to Jonathan's discharge, Dr. Bloom saw Jonathan on April 18, 1985. Dr. Bloom negligently concluded that Jonathan was not suicidal. On April 22, 1985, 11 days after his discharge from the Hospital, Jonathan purchased a rifle at Big 5 and committed suicide by means of a self-inflicted gunshot wound.

## B. *Motion for Summary Judgment*

In its motion for summary judgment, the Hospital contended that it owed no duty to the Jacoveses, or to Jonathan once Jonathan was discharged from the Hospital; it had no duty to inform and was not negligent in failing to inform the Jacoveses or Jonathan's doctors of Jonathan's comments to Biroc on the day of his discharge; and Dr. Bloom was not the Hospital's agent or employee. The Hospital additionally argued that Jonathan's postdischarge visits with Drs. Bloom and Peck, as well as the Jacoveses' postdischarge observation of Jonathan, were superseding causes of Jonathan's suicide. The Hospital further argued that Jonathan's purchase of the rifle constituted a superseding cause of his suicide. The motion was based on undisputed facts in the second amended complaint, the unpublished writ opinion,[5] the Jacoveses' responses to requests for admissions, Jonathan's medical records and the depositions of Dr. Peck, the Jacoveses and Dr. Bloom.

## C. *The Hospital's Separate Statement of Undisputed Facts*

Jonathan was first seen by his treating psychologist, Michael Peck, Ph.D., on December 13, 1984. On March 26, 1985, Jonathan attempted to commit suicide and was transported to Beverly Hills Medical Center, where he remained until March 28, 1985. Dr. Peck recommended that Jonathan continue his hospitalization under the care of psychiatrist Lee Bloom, M.D.,

---

[5]On appeal, questions that are presented and decided by the appellate court from a judgment on demurrer become law of the case and conclusively establish the law in any subsequent appeal between the same parties in the same case, unless the evidence is " ' "substantially different in a material aspect." ' " (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57 [192 Cal.Rptr. 857 [665 P.2d 947].) The facts presented in the parties' statements of undisputed facts are substantially and materially different than the facts before Division One of this court in the first amended complaint. Therefore, this unpublished writ opinion does not control our disposition under the doctrine of law of the case.

at Coldwater Canyon Hospital, where Dr. Bloom had admitting privileges. The Jacoveses had confidence in Dr. Peck and desired to follow his recommendation. Since there were no beds available at Coldwater Canyon Hospital, Jonathan was admitted to the Hospital, where Dr. Bloom also had admitting privileges. The Jacoveses chose the Hospital because Dr. Bloom was on staff there. Dr. Bloom maintained staff privileges at nine hospitals.

At the Hospital, Dr. Bloom was Jonathan's attending physician, a member of the medical staff with admitting privileges and the director of the Hospital's adolescent psychiatric unit. Dr. Bloom had no office at the Hospital. He billed separately for his services. Dr. Peck was Jonathan's primary therapist during Jonathan's stay at the Hospital and saw Jonathan three times a week. Dr. Peck received verbal promises from Jonathan that he would not commit suicide. Dr. Bloom treated the family, as well as Jonathan, in weekly family meetings.[6] On April 9, 1985, in a family meeting, Dr. Bloom proposed that Jonathan sign a contract with his family in which he would promise, among other things, not to commit suicide.

On April 11, 1985, Jonathan told Biroc, the Hospital's psychiatric aide assisting in Jonathan's discharge, that he doubted if he could live up to the contract. Biroc recorded this statement in the Hospital chart. Dr. Bloom was not notified of this statement. Dr. Bloom did not believe he should have been personally notified of the statement because it was immaterial to his opinion to discharge Jonathan. Drs. Bloom and Peck did not interpret the statement to Biroc as a statement of suicidal intent.

On April 11, 1985, Dr. Bloom saw Jonathan and discharged him from the Hospital. Dr. Bloom believed Jonathan was not a suicidal danger to himself. The duty to discharge is solely that of the psychiatrist or primary therapist. A Hospital employee, such as a psychiatric nurse or aide, has no authority to discharge a patient from the Hospital. Dr. Peck concurred in Jonathan's release because he believed that Jonathan's suicidal ideations had diminished. Both Drs. Bloom and Peck would not have released Jonathan if they had thought Jonathan was a suicide risk, and there is no way they could have predicted Jonathan's suicide.

On the evening of his discharge, after he had returned home, Jonathan signed the contract with his parents not to commit suicide. After his discharge, Jonathan saw Dr. Peck on April 12, 1985, and again on April 16,

---

[6]Dr. Bloom testified at his deposition that: "The psychiatrist sees the patient three times a week. And either the psychologist or the psychiatrist or both treat the family in a family session weekly. [¶] . . . I have a family meeting with the family where I make a diagnosis and spend an hour, an hour and a half, going over the illness, trying to show them what it is. I am discussing some of the things we talked about, going over the history, showing them how things are, talking about the options."

1985. At his April 16, 1985, visit, Jonathan stated to Dr. Peck that he had definitely made up his mind not to commit suicide. At that visit, Dr. Peck concluded that Jonathan's suicidal ideations were diminished. Jonathan saw Dr. Bloom on April 18, 1985, and Dr. Bloom felt that things were looking better and found no reason to suspect that Jonathan would commit suicide. Drs. Bloom and Peck spoke to each other about Jonathan after his discharge and concluded that things were going well. Jonathan planned to go to Palm Desert with his father on the weekend of April 19, 1985. Dr. Peck was pleased with this plan and felt that Jonathan's risk of suicide was less than it had been in some time. While in Palm Desert, Jonathan did not mention suicide and told his father he was glad he had not killed himself. They returned home from Palm Desert on Sunday evening, April 21, 1985. Dr. Peck called Ira Jacoves that evening, and Ira Jacoves told Dr. Peck that "things seemed pretty good."

On April 22, 1985, Jonathan bought a rifle and committed suicide.

After Jonathan's discharge, neither Jonathan nor anyone else sought to have Jonathan rehospitalized. Dr. Peck believed that Jonathan did not intend to commit suicide when he left the Hospital nor during his posttreatment sessions. Dr. Peck believed that Jonathan decided to commit suicide after he left the Hospital and after his posthospitalization treatment sessions. Dr. Peck had no criticism of Dr. Bloom's treatment of Jonathan. The Jacoveses had no contact with the Hospital after Jonathan was discharged.

D. *The Jacoveses' "Separate Statement of Disputed and Undisputed Material Facts"*

The Jacoveses' separate statement did not attempt to controvert most of the facts asserted to be undisputed by the Hospital. Instead, they contended that many of the facts set forth were irrelevant to the resolution of the motion for summary judgment because the undisputed facts did not negate their assertions of agency, negligent treatment, negligent discharge due to the exhaustion of insurance coverage,[7] failure to warn of Jonathan's statement to Biroc and improper reliance on Jonathan's suicide prevention contract.

The Jacoveses presented the following facts: Dr. Bloom was director of the Hospital's adolescent psychiatric unit. The Jacoveses believed that Dr. Bloom was the Hospital's head psychiatrist, was actively involved in the Hospital and would oversee Jonathan's treatment in the Hospital. Dr. Bloom discharged Jonathan because Jonathan's insurance had expired, without first

---

[7]This assertion was not alleged in the second amended complaint, but was alleged for the first time in the Jacoveses' opposition to the Hospital's motion for summary judgment.

consulting the Jacoveses as to their finances. Dr. Bloom released Jonathan telephonically and did not see Jonathan on the day before or on the day of his discharge. Drs. Bloom and Peck did not know of, and were not notified of, Jonathan's suicidal comment to Biroc, even though they should have been so notified. On April 16, 1985, Jonathan told his psychologist that he had definitely *not made up his mind* to commit suicide. He did not say that he had definitely made up his mind *not to commit* suicide. Jonathan was discharged from the Hospital contingent on his contract with his parents not to kill himself and on his continued medication and treatment. Jonathan's discharge was based on incomplete information because Jonathan's comment to Biroc was not known by Drs. Bloom or Peck.

The Jacoveses submitted the expert opinion of Robert I. Amstadter, M.D., who stated that Jonathan's treatment fell below the standard of care because Jonathan had not been examined by a physician prior to his discharge and had been prematurely discharged. The Jacoveses also submitted the expert opinion of Joseph Lebenzon, M.D., who stated that there were serious deficiencies in the clinical evaluation, diagnosis, treatment and management of Jonathan. "Clearly, from the documented nurse's records and failure to clinically monitor [Jonathan] around the sensitive time of discharge, there persisted suicidal ideations and obsessions which themselves declare a significant suicidal risk, for which only two clinical options could be safely allowed: continued treatment at the Van Nuys Psychiatric Hospital or transfer to an inpatient unit at a county facility." The Jacoveses also submitted Jonathan's medical records from the Hospital.

E. *Standard of Review*

In reviewing a summary judgment, we must determine if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) ■ "A defendant moving for summary judgment must conclusively negate a necessary element of the plaintiff's case or establish a complete defense and thereby demonstrate that under no hypothesis is there a material factual issue which requires the process of a trial." ·(*Saatzer* v. *Smith* (1981) 122 Cal.App.3d 512, 517 [176 Cal.Rptr. 68].) Unless the moving party meets this standard, plaintiffs have no obligation to file their own declarations in order to defeat the motion. (*Preis* v. *American Indemnity Co.* (1990) 220 Cal.App.3d 752, 757 [269 Cal.Rptr. 617].) ■ In reviewing a grant of summary judgment, we must make our own independent determination of the construction and effect of the papers submitted and the validity of the ruling is reviewable irrespective of the reasons stated. (*Ibid.*)

Upon an independent review of the construction and effect of the papers submitted below, we conclude that summary judgment was improper because triable issues of fact exist. Specifically, triable issues of fact exist as to whether Dr. Bloom acted as an actual or ostensible agent of the Hospital, and whether the Hospital, through Dr. Bloom, Biroc and others, owed the Jacoveses a duty which it breached by negligently caring for and discharging Jonathan.

## F. Agency

Plaintiffs contend that in determining the viability of their causes of action against the Hospital for both wrongful death and negligent infliction of emotional distress, triable issues of fact exist as to whether Dr. Bloom acted as an actual or ostensible agent of the Hospital when he negligently cared for and treated Jonathan. The Hospital does not dispute that triable issues of fact exist concerning Dr. Bloom's negligent treatment of Jonathan. The Hospital argues, however, that the evidence as to agency is susceptible of the single inference that Dr. Bloom was not the Hospital's actual or ostensible agent because he was directly employed by the Jacoveses as Jonathan's physician, was mentioned separately in the Hospital's admission forms, billed separately for his services, maintained staff privileges at eight other hospitals, and had no office in the Hospital. The Hospital also relies on the fact that physicians often serve as voluntary heads of hospital units without becoming agents or employees of the Hospital.[8]

"An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency." (Civ. Code, § 2295.) Agency is either actual or ostensible. (Civ. Code, § 2298.) "An agency is actual when the agent is really employed by the principal." (Civ. Code, § 2299.) An ostensible agency is established when a principal intentionally, or by want of ordinary care, causes a third person to believe another is an agent. (Civ. Code, §§ 2300, 2317.) ■ A principal is liable for the acts of an ostensible agent when third parties have justifiably relied on representations made by the principal. (Civ. Code, § 2334.) A principal is also liable when the principal knows the agent holds himself or herself out as clothed with certain authority and remains silent. (Preis, supra, 220 Cal.App.3d at p. 761.)

■ A hospital is liable for a physician's malpractice when the physician is actually employed by or is the ostensible agent of the hospital. (Elam v. College Park Hospital (1982) 132 Cal.App.3d 332, 337 [183 Cal.Rptr. 156]; Meier v. Ross General Hospital (1968) 69 Cal.2d 420, 434-435 [71 Cal.Rptr.

[8]No facts in the record support this assertion.

903, 445 P.2d 519]; *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 166-168 [41 Cal.Rptr. 577 [397 P.2d 161]; *Seneris* v. *Haas* (1955) 45 Cal.2d 811, 829-832 [53 A.L.R.2d 124].) A physician is not an agent of a hospital merely because he or she is on the medical staff of the hospital. (*Mayers* v. *Litow* (1957) 154 Cal.App.2d 413, 417-418 [316 P.2d 351].) However, a physician may be an agent of a hospital even where the physician bills separately for his or her services and is a member of the medical staff, if other facts are present which indicate that an agency exists. (*Quintal, supra*; *Seneris, supra*.) The head of a psychiatric department of a hospital may be an agent of the hospital. (*Richard H.* v. *Larry D.* (1988) 198 Cal.App.3d 591, 596 [243 Cal.Rptr. 807]; *Meier, supra*.)

■ On the issue of actual agency, no facts were presented by the Hospital which conclusively established that Dr. Bloom was not employed by and did not receive compensation from the Hospital, or held his position as director of the adolescent psychiatric unit on a voluntary basis. No explanation was provided as to why Dr. Bloom's releases from liability were obtained through the Hospital. Moreover, Dr. Bloom's duties as the Hospital's director of the adolescent psychiatric unit were undefined.[9] The facts that Dr. Bloom billed for his services separately from the Hospital, maintained staff privileges at other hospitals and had no office at the Hospital are not dispositive of the agency issue. Accordingly, we conclude that triable issues of fact exist as to whether Dr. Bloom acted as the Hospital's actual agent in the course and scope of his duties as director of the adolescent psychiatric unit.

■ On the issue of ostensible agency, there are also insufficient facts to negate the reasonable inference that the Hospital intentionally or unintentionally caused the Jacoveses to justifiably rely on its implied representations that Dr. Bloom was the Hospital's ostensible agent. Such reasonable inferences may be drawn from the fact that the Hospital designated Dr. Bloom as director of its adolescent psychiatric unit and because it obtained releases for him on its admission forms. It is also reasonable to infer that the Jacoveses based their decision to admit Jonathan to the Hospital at least in part on Dr. Bloom's position with the Hospital. We conclude, therefore, that triable issues of fact exist as to whether the Jacoveses reasonably believed that Dr. Bloom was acting as agent for the Hospital in his treatment and supervision of Jonathan at the Hospital.[10]

---

[9]It is also not clear from the record whether Jonathan, who was 20 years old at the time of his hospitalization, was admitted to the adolescent unit.

[10]Neither BAJI No. 6.21 nor *Marmion* v. *Mercy Hospital & Medical Center* (1983) 145 Cal.App.3d 72 [193 Cal.Rptr. 225], which preclude a finding of doctor-hospital agency based

## G. *Wrongful Death: Duty*

Plaintiffs contend that the Hospital is not entitled to judgment, as a matter of law, on the cause of action for wrongful death based on negligence, because triable issues of fact exist as to whether the Hospital owed a duty to Jonathan and whether it breached that duty.

■ Wrongful death is a statutorily created cause of action for pecuniary loss brought by heirs against a person who causes the death of another by a wrongful act or neglect. It is original in nature and does not represent a right of action that the deceased would have had if the deceased had survived the injury. (Code Civ. Proc., § 377; *Reyna* v. *San Francisco* (1977) 69 Cal.App.3d 876 [138 Cal.Rptr. 504].) It is a cause of action for the heir who recovers for the pecuniary loss suffered on account of the death of the relative. (*Id.* at p. 882.) In any action for wrongful death resulting from negligence, the complaint must contain allegations as to all the elements of actionable negligence. (*Potter* v. *Richards* (1955) 132 Cal.App.2d 380, 385 [282 P.2d 113].) Negligence involves the violation of a legal duty imposed by statute, contract or otherwise, by the defendant to the person injured, e.g., the deceased in a wrongful death action. (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 292 [253 Cal.Rptr. 97, 763 P.2d 948].)

■ A hospital is liable for want of ordinary care, including a nurse's or an aide's incompetence or failure in duty. A hospital's duty of care extends to safeguarding a patient from dangers due to mental incapacity. (*Wood* v. *Samaritan Institution* (1945) 26 Cal.2d 847, 852 [161 P.2d 556].) If those who are caring for and treating mentally disturbed patients know of facts from which they could reasonably conclude that the patient would be likely to self-inflict harm in the absence of preventative measures, then those caretakers must use reasonable care under the circumstances to prevent such harm from occurring. (*Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465, 469; *Meier, supra,* 69 Cal.2d at p. 424 [62 Cal.Rptr. 577, 432 P.2d 193].)

■ In diagnosing and treating patients, doctors must exercise the reasonable degree of skill, knowledge and care ordinarily exercised by doctors under similar circumstances in their professional community. The standard of skill, knowledge and care prevailing in a medical community is ordinarily a matter within an expert's knowledge. Expert opinion, therefore, is required to determine the probability of negligence where a medical process is not a matter of common knowledge. (*Folk* v. *Kilk* (1975) 53 Cal.App.3d 176, 185

---

on a doctor's treatment of a patient at a hospital, compel a different result. In the case at bench, Dr. Bloom was director of the Hospital's adolescent psychiatric unit and may have been an agent or employee of the Hospital in this capacity.

[126 Cal.Rptr. 172].) Diagnosis, treatment and care of a schizophrenic and suicidal psychiatric patient, and the standard of care prevailing in the medical community for such patients, are not matters of common knowledge.

In *Bellah* v. *Greenson* (1978) 81 Cal.App.3d 614 [17 A.L.R.4th 1118], the appellate court applied the long-established duty of care that doctors owe to patients to psychiatrists who treat patients on an outpatient basis. In *Bellah*, two years after plaintiffs' daughter committed suicide, plaintiffs brought a wrongful death action against a psychiatrist who had been treating her on an outpatient basis. Plaintiffs alleged the existence of a psychiatrist-patient relationship, knowledge on the psychiatrist's part that the daughter was likely to attempt suicide, and the psychiatrist's failure to take appropriate preventative measures in keeping with the standards of good medical practice in the community. In *Bellah*, the appellate court concluded plaintiffs had stated a cause of action for wrongful death, based on professional malpractice, by alleging a psychiatrist's, or hospital's, treatment of a suicidal patient fell below the standard of care for the profession. (*Ibid.*)[11]

Although Drs. Bloom and Peck state that Jonathan's diagnosis, care and treatment were not negligent, the Jacoveses have presented expert testimony which is contrary and which raises a triable issue of fact as to Dr. Bloom's and the Hospital's negligence. In Dr. Amstadter's expert opinion, Jonathan's treatment fell below the standard of care because he was not diagnosed properly, was not seen prior to discharge and was prematurely discharged. Dr. Amstadter stated that Jonathan's conversations about suicide were not taken seriously. In Dr. Lebenzon's expert opinion, he concluded there were serious deficiencies in the clinical evaluation, diagnosis, treatment and management of Jonathan, and that Jonathan should not have been discharged.

We conclude that the conflicting expert opinions demonstrate there are triable issues of fact as to whether the Hospital, through Dr. Bloom, Biroc and others, exercised the reasonable degree of skill, knowledge, and care ordinarily exercised by medical care providers under similar circumstances in their professional community.

H. *Negligent Infliction of Emotional Distress: Duty*

The Jacoveses contend the trial court erred in granting summary judgment on their cause of action for negligent infliction of emotional distress because

---

[11]Though the Hospital argues this holding in *Bellah* is dictum and not controlling because the wrongful death cause of action in *Bellah* was also time barred, the Supreme Court in *Nally, supra,* 47 Cal.3d at page 294, specifically approved this reasoning of *Bellah.*

triable issues of fact exist as to whether the Hospital owed the Jacoveses a duty of care as a result of their status as joint patients, instrumentalities of Jonathan's treatment and contracting parties for the care of Jonathan.

In resolving this issue, it is important to bear in mind the procedural posture of this case. In their first amended complaint, the Jacoveses alleged a cause of action against the Hospital for negligent infliction of emotional distress. Hospital's demurrer to their cause of action was overruled by the trial court. On petition for writ of mandate, Division One of this district held that the Jacoveses had failed to state a cause of action against the Hospital as direct victims of the Hospital's negligent infliction of emotional distress. Division One stated, however, that the Jacoveses should be given leave to amend to allege additional facts, such as (1) Jonathan's discharge was conditioned on his parents' willingness to care for him at home, and they were unwilling to do so without some assurance Jonathan would agree not to harm himself, (2) the Jacoveses became direct intended beneficiaries of Jonathan's care, or (3) the Jacoveses were intentionally included as instrumentalities of Jonathan's treatment. The Jacoveses amended their complaint to include additional allegations relating to their status as direct victims. In its motion for summary judgment, the Hospital stated, without elaboration, that it owed no duty to the Jacoveses on their cause of action for negligent infliction of emotional distress. The Hospital included no undisputed facts in its separate statement relating to this issue and presented no evidence rebutting the direct victim allegations of the complaint.

■ Negligent infliction of emotional distress, which is simply the tort of negligence, contains the traditional elements of duty, breach of duty, causation and damages. (*Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1072 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) The existence of the element of duty is a question of law which depends upon the foreseeability of the risk and a weighing of policy considerations for and against the imposition of liability. (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588-590 [257 Cal.Rptr. 98, 770 P.2d 278].) In California, the right to recover for emotional distress was initially limited to plaintiffs who suffered physical injury from an impact with accompanying emotional distress, or plaintiffs who did not suffer physical injury from an impact but were in the "zone of danger" and suffered emotional trauma resulting in physical injury. (*Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 651 [771 P.2d 814].) In 1968, the Supreme Court expanded the right to recover emotional distress damages to foreseeable "bystanders" who suffered emotional distress resulting in physical injury as a result of witnessing an injury to another. (*Dillon* v. *Legg* (1968) 68 Cal.2d 728 [441 P.2d 912 [29 A.L.R.3d 1316].) ■ In 1980, the Supreme Court again broadened the theory of

recovery for emotional distress to "direct victims" who were owed a duty by the defendant and who suffered emotional distress which was not accompanied by any physical injury. (*Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [616 P.2d 813, 16 A.L.R.4th 518].) In a direct victim case, a plaintiff seeks damages for emotional distress resulting from a breach of duty owed the plaintiff which is "assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two." (*Marlene F.*, *supra*, 48 Cal.3d at p. 590.) A direct victim cause of action for negligent infliction of emotional distress will lie "where a duty arising from a preexisting relationship [e.g. physician-patient] is negligently breached." (*Burgess*, *supra*, 2 Cal.4th at p. 1074.)

In *Molien*, *supra*, 27 Cal.3d 916, the Supreme Court held that a hospital and a doctor owed a direct duty to a patient's husband for the emotional distress the husband suffered as a result of the misdiagnosis of the wife as having a sexually transmitted disease and directing the wife to inform her husband, have him get tested and, if necessary, treated. The Supreme Court concluded it was not only foreseeable the husband would suffer emotional distress, but the alleged tortious conduct was directed to the husband as well as his wife. (*Id.* at p. 923; see *Burgess*, *supra*, 2 Cal.4th at p. 1074.) "By directing the husband be told of a diagnosis that foreseeably would disrupt the marital relationship and require the husband to be physically examined, the doctor assumed a duty to convey accurate information and the husband accordingly was a 'direct victim' of the doctor's negligence." (*Marlene F.*, *supra*, 48 Cal.3d at p. 590.)

The direct victim theory of recovery for negligent infliction of emotional distress with no accompanying physical injury was revisited in *Marlene F.* In *Marlene F.*, the mothers of two boys who were molested by a therapist treating both the mothers and their sons for intrafamily problems were permitted to maintain a cause of action for negligent infliction of emotional distress against the therapist. The Supreme Court concluded that the therapist had a duty to the mothers, because the mothers were also his patients, were being treated by him for intrafamily difficulties and the therapist was aware of the patients' relationships. (*Marlene F.*, *supra*, 48 Cal.3d at pp. 585-591.) When the therapist molested the boys, he breached his duty of care to the mothers as well as the boys. The *Marlene F.* court further concluded that "the mothers stated a cause of action for the negligent infliction of emotional distress against the therapist who molested their sons in the course of a professional relationship involving both mother and son." (*Id.* at p. 592; see also *Burgess*, *supra*, 2 Cal.4th at p. 1075.)

In *Marlene F.*, the Supreme Court did not consider whether a cause of action could also be maintained for negligent infliction of emotional distress

based solely on a contract the parents entered into for the care of their child. It merely pointed out there was a split of authority on that proposition and concluded "[i]n the present case, the existence of a contract to provide care for the children *bolsters* the mothers' showing that the therapist also owed them a duty of care, but their claim does not rest solely, or even necessarily, on that contract." (*Marlene F.*, *supra*, 48 Cal.3d at pp. 591-592, fn. 7, italics in original.)

The Hospital contends the facts in this case are distinguishable from the facts of *Molien*, *supra*, and *Marlene F.*, *supra*, and more similar to the facts of *Schwarz* v. *Regents of University of California* (1991) 226 Cal.App.3d 149 [276 Cal.Rptr. 470]. In *Schwarz*, this district held that a father was not a direct victim of a psychotherapist's negligence and, therefore, could not state a cause of action for negligent infliction of emotional distress. In *Schwarz*, the complaint alleged that plaintiff's minor son had begun psychotherapy with defendant for bed-wetting problems. In the course of therapy, it was discovered the son also suffered from an adjustment disorder arising out of a bitter divorce situation. The father agreed to pay for the therapy and periodically met with the therapist to assist in the son's therapy. Later, the therapist assisted the mother in removing the son from the country and concealing the son's whereabouts from the father. The father did not discover his son's whereabouts for almost two years.

The *Schwarz* court held that the intent and purpose of the therapy was to treat the son only. It contrasted this purpose with the purpose of the therapy in *Marlene F.*, to treat intrafamily dysfunction. Moreover, in *Schwarz*, the father did not receive psychotherapy from the son's therapist, as did the mothers in *Marlene F.* Accordingly, a professional relationship between the father and his son's therapist did not exist. The *Schwarz* court also held that "the simple existence of a contract between a parent and a medical caregiver to provide medical treatment for a child is not in itself sufficient to impose on the caregiver a duty of care owed to the parent." (*Schwarz*, *supra*, 226 Cal.App.3d at p. 168.)

We find the facts of this case more closely resemble *Marlene F.* as to a duty based on a physician-patient relationship and *Molien* as to a duty assumed by a defendant. ▆▆ We hold a hospital or doctor may be liable to the parents of a psychiatric patient for negligent infliction of emotional distress damages caused by the breach of a duty to the parents arising out of a physician-patient relationship or assumed by the hospital or doctor. Such an assumed duty may arise from the utilization of the parents as active instrumentalities in the patient's treatment.

In this case, the complaint alleged the following: Jonathan was admitted to the Hospital for treatment of suicidal tendencies after a suicide attempt. The

Jacoveses signed a contract with the Hospital for Jonathan's care which required the Jacoveses' concurrence in its "authorizations and understandings," even though Jonathan was of legal age and aware of his admission and treatment. The contract was for the benefit of the Jacoveses' parental interests and concerns and for their own well-being. The Jacoveses were active instrumentalities in Jonathan's treatment. Dr. Bloom or Dr. Peck, or both, "treat[ed] the family in a family session weekly." The Jacoveses were intended to benefit from their participation in group therapy with Jonathan. They received various representations with regard to Jonathan's treatment "to ensure their contemporaneous awareness and ongoing treatment of [Jonathan]." At Dr. Bloom's request at one of the family sessions, the Jacoveses agreed to enter into a contract with Jonathan, "as part of [Jonathan's] treatment, providing that he would not commit suicide." Jonathan was discharged to the Jacoveses' home based, in part, on his agreement to sign the nonsuicide contract. Jonathan told a hospital employee, just prior to his discharge, that he doubted whether he could comply with his agreement. The Jacoveses were not informed of this statement. The Jacoveses were the intended beneficiaries of the nonsuicide contract, in which they agreed they wanted Jonathan living at home and Jonathan agreed he wanted to live at home and promised not to commit or try to commit suicide for the next four months. The Jacoveses had the sole responsibility for their son and were Jonathan's sole providers of support, care, and treatment. Dr. Bloom told the Jacoveses to keep an eye on Jonathan.

In its motion for summary judgment and its accompanying separate statement and supporting evidence, the Hospital failed to present any evidence negating the allegations of the complaint with respect to the issue of the duty of the Hospital to the Jacoveses. In fact, the Hospital presented evidence in the form of Dr. Bloom's deposition testimony that the family was treated in a weekly session and Dr. Bloom proposed the entering into of a nonsuicide contract between the Jacoveses and Jonathan.

We conclude that triable issues of fact exist in this case as to whether the Hospital owed the Jacoveses a direct duty which arose pursuant to a professional relationship. As in *Marlene F., supra,* and *Molien, supra,* the Jacoveses set forth allegations in their complaint which stated a cause of action for negligent infliction of emotional distress. The Jacoveses' allegations in their second amended complaint that they were the intended beneficiaries of the group therapy and the nonsuicide contract, were treated as patients in the weekly family sessions, and were utilized as active instrumentalities in Jonathan's treatment adequately pled a duty owed by the

Hospital to the Jacoveses.[12] We find no facts presented by the Hospital which negate these allegations. Indeed, Dr. Bloom's statement that the family was being treated leads to a reasonable inference that a professional relationship for the benefit of the Jacoveses existed. Thus, it is for a jury to decide whether the Hospital's acts, through its agents, constituted professional negligence as to the Jacoveses.

## I. Superseding Cause

As to each cause of action, the Jacoveses also argue that there is a triable issue of fact as to whether the doctors' and their own conduct, after Jonathan's discharge, was the superseding cause of Jonathan's suicide. They also assert that the acts of Jonathan in committing suicide cannot constitute a superseding cause.

Proximate cause is legal cause and is a question of law, except when conflicting inferences or conclusions can be drawn from the evidence. (*Tate* v. *Canonica* (1960) 180 Cal.App.2d 898, 901 [5 Cal.Rptr. 28].) Where, as here, the intervening conduct is simply the failure to protect a person from a harm that was directly threatened by the defendant's prior negligence, the intervening conduct is not a superseding cause which will break the chain of causation. (See, e.g., *Fish* v. *Los Angeles Dodgers Baseball Club* (1976) 56 Cal.App.3d 620 [128 Cal.Rptr. 807, 91 A.L.R.3d 1].) "The usual rule is 'that the intervening act of a third person does not relieve the original wrongdoer of liability if the intervening act was a reasonably foreseeable result of the original actor's wrongdoing.'" (*Tate, supra,* at p. 918.)

Here, the issue is whether Jonathan was negligently diagnosed, treated, and discharged by the Hospital through its agents. The Jacoveses have presented facts which indicate that Jonathan was prematurely discharged in light of his continuing active suicidal ideation, based on improper considerations of insurance coverage, and an inappropriate reliance on his nonsuicide contract with his parents. The essence of the action is that Jonathan's suicide was the proximate result of the Hospital's negligence in discharging him prematurely without adequate warnings to his caretakers concerning his continuing active suicidal ideation. If the Hospital's negligence was the proximate cause of Jonathan's suicide, the failure of his doctors and parents to subsequently prevent that suicide is not a superseding cause relieving the Hospital of liability.

---

[12]The Jacoveses also allege that they were direct victims as the intended beneficiaries of the Hospital's admission contract, because it was for the benefit of their parental interest and concerns and for their well-being. We need not address this issue because the Jacoveses' claim does not rest solely, or even necessarily, on the contract. (*Marlene F., supra,* 48 Cal.3d at p. 591, fn. 7.)

Moreover, the Hospital presented no facts which establish that Drs. Bloom and Peck negligently failed to rehospitalize Jonathan. There is nothing in the record to indicate they had knowledge of any new information which would have led them to believe Jonathan intended to again attempt to kill himself. Nor do the facts indicate that the Jacoveses had any such information. Moreover, Jonathan's suicide, itself, was the foreseeable risk and cannot, therefore, be a superseding cause.

We conclude the Hospital has not met its burden of demonstrating that any subsequent superseding causes of Jonathan's death existed as a matter of law.

## J. Conclusion

We conclude the summary judgment was improperly granted because triable issues of fact exist as to whether: (1) Dr. Bloom was the Hospital's agent; (2) the Hospital acted negligently through its agents; (3) the Hospital owed a duty to Jonathan and the Jacoveses; and (4) any subsequent superseding cause relieved the Hospital of liability for its negligence.

II

### BIG 5's MOTION FOR JUDGMENT ON THE PLEADINGS

## A. Facts Alleged in the Complaint

On April 22, 1985, Jonathan attempted to buy a handgun and ammunition from Big 5. Big 5 is a sporting goods store which sells firearms and ammunition. Jonathan left without buying a handgun because forms were required to be filled out, which would delay his purchase.[13] Later that day, Jonathan returned to Big 5. Big 5 employees observed that Jonathan appeared to be youthful, confused, distraught, and trembling. Jonathan was then sold a .22-caliber rifle and .22-caliber ammunition, and he was instructed in their use.[14] Big 5 "knew or should have known, as experienced and reasonably prudent business persons, that the youthful, confused, distraught and trembling appearance of [Jonathan] was cause for prudent determination and investigation of [Jonathan] before selling him a dangerous and lethal weapon." Big 5 has "a duty to [the Jacoveses] and the public to act in a reasonable and prudent manner when selling potentially lethal and dangerous firearms to persons such as [Jonathan]." Big 5 breached that duty.

---

[13]A seller of concealable firearms must report any sale of weapons to the California Department of Justice and wait 15 days before delivering it to the purchaser. (Pen. Code, §§ 12072, 12076; *Katona* v. *County of Los Angeles* (1985) 172 Cal.App.3d 53, 58 [218 Cal.Rptr. 19].)

[14]There was no waiting period under the law for Jonathan to purchase the rifle.

Later that same day, Jonathan committed suicide with the .22-caliber rifle he purchased from Big 5. As a proximate result, the Jacoveses suffered damages.

B. *Standard of Review*

█ A motion for judgment on the pleadings may be made at any time either prior to the trial or at the trial itself. (*Ion Equipment Corp.* v. *Nelson* (1981) 110 Cal.App.3d 868, 877-878 [168 Cal.Rptr. 361].) Such motion may be made on the ground that the pleading at issue fails to state facts sufficient to constitute a legally cognizable claim. (*Ibid.*; *Sofias* v. *Bank of America* (1985) 172 Cal.App.3d 583, 586 [218 Cal.Rptr. 388]; *Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 411-412 [62 Cal.Rptr. 401, 432 P.2d 3]; Code Civ. Proc., § 430.10, subd. (e).) Our review is guided by the same rules governing the review of the sustaining of a general demurrer. █ " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.]' [] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]" (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) █ Facts which give rise to the existence of a duty in a complaint for negligent injury are necessary, and a complaint which does not state facts to show that duty is fatally defective. (*Wise* v. *Superior Court* (1990) 222 Cal.App.3d 1008, 1013 [272 Cal.Rptr. 222].)

C. *Issues on Appeal*

The Jacoveses contend that Big 5 "had a duty of care not to sell the rifle to Jonathan because it was reasonably foreseeable that Jonathan would use [the] rifle to injure himself [and] that Jonathan's suicide is an intervening, but was not a superseding, cause since it was a reasonably foreseeable act." The Jacoveses do not contend that Big 5 had a duty to prevent Jonathan's suicide.

As alleged, both causes of action for wrongful death and negligent infliction of emotional distress have as necessary elements all the traditional elements of negligence, i.e., duty, breach of duty, causation, and damage. (*Marlene F.*, *supra*, 48 Cal.3d at pp. 588-590; see wrongful death discussion *post.*)[15] The contested and dispositive issues are: (1) whether a legal duty was owed by Big 5 to Jonathan for purposes of the wrongful death cause of

---

[15]The parties do not dispute that the Jacoveses are heirs for the purpose of their wrongful death cause of action. The parties also do not dispute that Jonathan died by shooting himself with the Big 5 rifle, causing damage to plaintiffs.

action and to the Jacoveses for purposes of the negligent infliction of emotional distress cause of action; and (2) whether Jonathan's suicide was a superseding cause of his death relieving Big 5 of liability.

D. *Wrongful Death: Duty*

 The Jacoveses contend that they properly pleaded a cause of action for wrongful death against Big 5 and that Big 5 owed Jonathan a duty of care not to sell him the rifle. Specifically, the Jacoveses argue that Big 5 negligently entrusted Jonathan with the rifle.

 To establish liability in negligence, it is a fundamental principle of tort law that there must be a legal duty owed to the person injured and a breach of that duty which is the proximate cause of the resulting injury. (*Katona, supra*, 172 Cal.App.3d at pp. 59-60.) The existence of a legal duty is a question of law which is simply an expression of the sum total of the policy considerations that lead a court to conclude that a particular plaintiff is entitled to protection. Fundamentally, a defendant owes a legal duty of care to persons who are foreseeably endangered by the defendant's conduct, but a defendant has no duty to control the conduct of another or to warn others endangered by another's conduct.[16] However, there are judicially created exceptions which impose a duty on a defendant to control the conduct of others when the defendant stands in some special relationship either with the person whose conduct needs to be controlled or with the person who is the foreseeable victim. (*Tarasoff, supra*, 17 Cal.3d at pp. 434-435; *Johnson* v. *County of Los Angeles* (1983) 143 Cal.App.3d 298, 307-308 [191 Cal.Rptr. 704].) In creating these exceptions, the judiciary has not rejected out of hand the common law rule of nonliability for nonfeasance. Instead, the judiciary has increased the number of situations where affirmative duties are imposed by expanding the list of special relationships. (*Tarasoff, supra*, at p. 435, fn. 5, 436.)

Generally, recognized categories of special relationships between a defendant and a person whose conduct needs to be controlled, as well as whose conduct defendant has the ability to control, include: parent and child, master and servant and one who takes charge of a third person who he or she knows or should know is likely to cause bodily harm to himself or herself or others if not controlled. (*Wise, supra*, 222 Cal.App.3d at pp. 1013-1014.)

---

[16]This common law rule arises from the distinction between misfeasance, for which liability is often imposed, and nonfeasance, for which liability is only reluctantly imposed. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435, fn 5 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Misfeasance is the improper performance of an act that is otherwise proper and nonfeasance is the nonperformance of an act that should be performed. (West's Legal Thesaurus/Dict. (1986) pp. 495, 520.)

Another recognized special relationship, which is applicable here, is the possessor of a chattel who has a duty to control the conduct of a licensee. ■ The California Supreme Court in *Richards* v. *Stanley* (1954) 43 Cal.2d 60 [271 P.2d 23] adopted the law set forth in Restatement Second of Torts section 390, which states that a duty is established when a chattel is supplied for use to a person known to be incompetent. "One who supplies . . . a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them." (Prosser, Law of Torts (4th ed.) § 33, p. 199; Rest.2d Torts, *supra*, § 390, p. 314; see, e.g., *Allen* v. *Toledo* (1980) 109 Cal.App.3d 415 [167 Cal.Rptr. 270] [father liable for wrongful death of woman whom his adult son killed with a truck negligently entrusted to the son by his father, and who the father knew or should have known was a reckless driver]; cf. *Wise, supra,* 222 Cal.App.3d at p. 1015 [no facts shown which constitute negligent entrustment of gun or suggest wife knew, or should have known, estranged husband was a danger to others when he engaged in a sniper attack on passing motorists with gun wife merely co-owned as community property].)

Those who may be liable as suppliers of chattels include not only lenders and donors but also sellers of chattels. (*Knighten* v. *Sam's Parking Valet* (1988) 206 Cal.App.3d 69, 75 [253 Cal.Rptr. 365]; *Dodge Center* v. *Superior Court* (1988) 199 Cal.App.3d 332, 340 [244 Cal.Rptr. 789].) The seller of a chattel "may not assume that human beings will conduct themselves properly if the facts which are known or should be known to him should make him realize that they are unlikely to do so. Thus, one who supplies a chattel for the use of another who knows its exact character and condition is not entitled to assume that the other will use it safely if the supplier knows or has reason to know that such other is likely to use it dangerously, as where the other . . . has a propensity or fixed purpose to misuse it." (Rest.2d Torts, *supra*, § 390, com. b, p. 315; see, e.g., *Johnson* v. *Casetta* (1961) 197 Cal.App.2d 272 [17 Cal.Rptr. 81] [seller of automobile liable to third party injured by purchaser when seller knew purchaser was inexperienced and incompetent to operate the automobile]; *Semeniuk* v. *Chentis* (1954) 1 Ill.App.2d 508 [117 N.E.2d 883, 884-885] [store owner who sold BB pellets to minor liable to father of girl injured by pellets shot by minor since store owner permitted a third person to engage in an activity when he knew or should have known the minor was likely to cause harm to others].)

A supplier of a chattel may be liable not only for harm sustained by a third party injured by the incompetent but also for harm sustained by the incompetent. "[I]f the supplier knows that the condition of the person to whom the

chattel is supplied is such as to make him incapable of exercising the care which it is reasonable to expect of a normal sober adult, the supplier may be liable for harm sustained by the incompetent . . . ." (Rest.2d Torts, *supra*, § 390, com. c, p. 317; *Blake* v. *Moore* (1984) 162 Cal.App.3d 700 [208 Cal.Rptr. 703]; *Splawnik* v. *DiCaprio* (1989) 146 A.D.2d 333 [540 N.Y.S.2d 615]; *Crown* v. *Raymond* (1988) 159 Ariz. 87 [764 P.2d 1146, 1149].)

A person owes a duty of care not to provide a dangerous instrumentality to an individual whose use of the instrumentality the supplier knows, or has reason to know, will result in injury. (*Talbott* v. *Csakany* (1988) 199 Cal.App.3d 700, 706 [245 Cal.Rptr. 136]; *Allen, supra,* 109 Cal.App.3d at p. 422.) ▇ Firearms and ammunition are dangerous instrumentalities. (*Warner* v. *Santa Catalina Island Co.* (1955) 44 Cal.2d 310, 317 [282 P.2d 12].)

Even though firearm use or possession has not been elevated to an ultrahazardous activity resulting in the imposition of absolute liability, civil laws hold firearm use or possession to the highest standard of due care. Even a slight deviation from this standard in the use or possession of a firearm may constitute actionable negligence. (See, e.g., *Warner, supra,* 44 Cal.2d at p. 317 [the standard of care for firearms is so great that a slight deviation therefrom will constitute negligence]; *Reida* v. *Lund* (1971) 18 Cal.App.3d 698, 704 [96 Cal.Rptr. 102] [wrongful death cause of action stated for negligent safeguard of a dangerous instrumentality against parents where parents failed to keep a firearm out of their child's possession and the child killed others and himself].)

We are aware of no California cases which have specifically addressed the issue of whether a seller of a firearm to a person who the seller knows, or has reason to know, is a danger to himself or herself, or others, is liable for injuries caused by the person to whom the firearm was sold. However, the law in California is clear that one is liable for injuries arising out of the negligent entrustment of a dangerous instrumentality to a person who the supplier knows, or has reason to know, is a danger to himself or herself, or others. For example, the supplier of an automobile, who entrusts the automobile to a known reckless driver, can be held liable for injuries to third persons. (*Allen, supra,* 109 Cal.App.3d at p. 422.) The supplier of a car to a known epileptic may be held liable for negligent entrustment. (*Talbott, supra,* 199 Cal.App.3d 700, 703, fn. 4.) One who leaves a firearm where a minor might foreseeably gain access to it may be liable for negligence. (See, e.g., *Reida, supra,* 18 Cal.App.3d at pp. 704-705.)

We may also turn to decisions in other jurisdictions which have held gun sellers liable, based either on common law or statute, for sale of a firearm to

persons showing signs of instability. In *Bernethy* v. *Walt Failor's, Inc.* (1982) 97 Wis.2d 929 [653 P.2d 280], the court reversed a summary judgment granted to a gun shop on a wrongful death action brought by a wife's estate. The decedent wife's visibly intoxicated husband obtained a gun and ammunition from the gun shop and immediately returned to a tavern and shot his wife. The appellate court, adopting section 390 of the Restatement Second of Torts, *supra*, concluded that the gun shop owed a duty of care to the wife, and that there were disputed facts which should go to the jury on the issue of proximate cause.

In *Crown, supra,* the court reversed a summary judgment on a wrongful death action entered in favor of a gun seller who sold a gun in violation of a state statute to a 17-year-old girl who later committed suicide with it. In *Cullum & Boren-McCain Mall, Inc.* v. *Peacock* (1980) 267 Ark. 479 [592 S.W.2d 442, 444], the court held that it was a question of fact whether a gun store breached its duty of care in selling a gun to a person who wanted a gun "which would blow a big hole in a man," who otherwise acted strangely, and who later shot a third party with the purchased gun. The court held there was sufficient evidence to submit to the jury the question of a gun dealer's negligence in selling a handgun to an adult where there was a question of fact concerning the buyer's language in describing his intent in buying the gun and it was obvious that the seller's employees had been suspicious of the buyer.

In *Angell* v. *F. Avanzini Lumber Co.* (Fla.Dist.Ct.App. 1978) 363 So.2d 571, the court held there was sufficient evidence precluding dismissal where a gun seller sold a rifle and ammunition to a woman who had a glazed look, hugged and kissed the clerk, pointed the rifle at the clerk's head, pulled the trigger repeatedly and attempted to load the rifle in the store. The clerk, who was apprehensive for his own safety, sold the rifle after he called the police, who told the clerk he had no obligation to sell the rifle. The purchaser shot and killed a third party. In *Decker* v. *Gibson Products Co. of Albany, Inc.* (11th Cir. 1982) 679 F.2d 212, the court held that there was a question of fact as to whether the gun seller breached its duty of care in selling a gun to a convicted felon who was known to have a violent history and who murdered his former wife two days later, even though the purchaser had shown a document indicating he could legally purchase a firearm.[17] ▮▮▮ Buyers of firearms, who appear to be a danger to themselves or others when

---

[17]A plethora of cases in other jurisdictions find those who provide guns to felons, minors or incompetents may be liable under either common law or negligent entrustment theories or pursuant to statute. In *Williams* v. *Bumpass* (Fla.Dist.Ct.App. 1990) 568 So.2d 979, the court held that a defendant who provided a gun to a furious and outraged person in a fight could be held liable for injuries to a third party under a theory of negligent entrustment. In *Peek* v. *Oshman's Sporting Goods, Inc.* (Tex.Civ.App. 1989) 768 S.W.2d 841, the court set forth the

purchasing a gun, are a class of individuals whom we legally recognize as incompetent to purchase firearms. Although their incompetence may not be sufficient to prevent them from being liable for their actions, persons who sell firearms to such individuals are also liable for injuries to the persons who are injured as a result of the purchase. If, during the normal course of the purchasing process, the seller knows or has reason to know that the purchaser is likely to be a danger to himself or herself, or others, the seller has a duty to decline to sell the firearm. In declining to sell the firearm, the seller exercises the control which an ordinary person would reasonably exercise so as not to cause injury to another.

In the present case, it is alleged that on April 22, 1985, Jonathan came to Big 5 and attempted to buy a handgun and ammunition. When he learned that forms would be required to be filled out necessitating a statutorily mandated waiting period delaying his purchase, he left the store without purchasing the handgun. Later, Jonathan came back to Big 5 and purchased a rifle, for which there was no statutorily mandated waiting period. At the time of this purchase, Jonathan appeared youthful, confused, distraught, and trembling. He purchased a rifle and ammunition and was instructed in the use of the rifle. On that same day, he committed suicide with the Big 5 rifle.

We conclude that the facts alleged in the second amended complaint are insufficient, as a matter of law, to state a cause of action against Big 5 for negligent entrustment of the rifle and ammunition to Jonathan. In order to impose a duty on Big 5 to refuse to sell the rifle and ammunition to Jonathan, the complaint must allege that Big 5 knew, or had reason to know, that Jonathan was reasonably likely to use the rifle to harm himself. The complaint does not allege that Big 5 knew Jonathan intended to commit suicide with the rifle. Nor are facts alleged which can reasonably be said to

---

principle that common law negligence theories can hold a seller liable when the prospective purchaser manifests behavior or comportment that put the seller on notice that the purchaser would foreseeably pose a danger to third persons if in possession of a firearm. (See, e.g., *First Trust Co.* v. *Scheels Hardware* (N.D. 1988) 429 N.W.2d 5 [victim sued seller of gun to boy who shot victim for negligent entrustment]; *Foster* v. *Arthur* (Fla.Dist.Ct.App. 1988) [519 So.2d 1092, 1094] [appellate court affirmed verdict for plaintiff who sued assailant's room-mate on the theory that she had negligently entrusted a firearm to the assailant, who she knew was a convicted murderer and a lifetime parolee who could not possess a firearm]; *Pair* v. *Blakly* (1978) 160 N.J. 14 [388 A.2d 1026] [summary judgment reversed and remanded for trial on common law negligence theory against defendant seller who sold BB's to minor]; *Olson* v. *Ratzel* (1979) 89 Wis.2d 227 [278 N.W.2d 238, 249, 4 A.L.R.4th 313] [seller of gun to minor liable under common law negligence theory to plaintiff who was injured when shot]; *Rubin* v. *Johnson* (Ind.Ct.App. 1990) 550 N.E.2d 324 [violation of handgun statute prohibiting sale to person who seller has reasonable cause to believe is of unsound mind is negligence per se and subsequent criminal use not intervening cause]; *Pereza* v. *Mark* (2d Cir. 1970) 423 F.2d 149 [gun lender liable to borrower who accidentally shot companion because borrower did not know gun was loaded].)

have given Big 5 reason to know that Jonathan intended to commit suicide. The facts, if proved, establish only that Jonathan, a young adult, wanted to purchase a firearm without waiting two weeks for its delivery and was confused, distraught and trembling. A salesclerk in a sporting goods store cannot reasonably be expected to have concluded, from these observations alone, that Jonathan intended to commit suicide. Jonathan's alleged demeanor was not on such a scale so as to manifest to the ordinary observer that Jonathan was mentally impaired, incompetent or irresponsible with regard to the handling of firearms. In the circumstances alleged in this case, there was, as a matter of law, no reason for Big 5 to anticipate a violent act on the part of Jonathan. (See, e.g., *Peek, supra,* 768 S.W.2d 841 [evidence that handgun buyer appeared to be nervous, uptight and in a hurry is insufficient, as a matter of law, to establish seller breached its duty of reasonable care toward any third party with respect to the sale of the handgun].)

E. *Negligent Infliction of Emotional Distress: Duty*

 The Jacoveses contend that the trial court erred in dismissing their cause of action for negligent infliction of emotional distress. As discussed *ante,* we weigh the foreseeability of the risk and policy considerations. (*Marlene F., supra,* 48 Cal.3d at pp. 588-590.) Recovery for negligent infliction of emotional distress is possible where the defendant owes the plaintiff a direct duty and the plaintiff suffers emotional distress, even where there is no accompanying physical injury. (*Molien, supra,* 27 Cal.3d 916.)[18]

The facts set forth show that Big 5 was a commercial establishment which sold firearms, Jonathan was an adult, and the Jacoveses had no contact with Big 5.

We conclude that under the facts set forth in their complaint, the Jacoveses have failed to allege facts which constitute a cause of action against Big 5 for negligent infliction of emotional distress. The facts do not establish any legally cognizable duty owed to the Jacoveses by Big 5.

DISPOSITION

The summary judgment (B054005) is reversed and remanded for further proceedings consistent with this opinion. The judgment on the pleadings

---

[18]The Jacoveses do not allege that they were present when Jonathan committed suicide.

(B052163) is affirmed.[19] The Jacoveses are awarded their costs on appeal from the Hospital. Big 5 is awarded its costs on appeal from the Jacoveses.

Boren, Acting P. J., and Ashby, J.,* concurred.

Respondents' petition for review by the Supreme Court was denied November 25, 1992. Panelli, J., and George, J., were of the opinion that the petition should be granted.

---

[19]The Jacoveses have not requested, either in the trial court or on appeal, leave to amend the second amended complaint to allege additional facts in support of their causes of action against Big 5.

*Retired Associate Justice of the Court of Appeal, Second District, sitting under assignment by the Chairperson of the Judicial Council.