Filed 7/30/14  In re N.G. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.G., a Person Coming Under the Juvenile Court Law. | H040737 (Santa Clara County Super. Ct. No. JD21466) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. N.G., Defendant and Appellant. | |

The Santa Clara County Department of Family and Children's Services (Department) brought dependency proceedings on behalf of N.G. under Welfare and Institutions Code section 300.[1]  Her father, whose initials are also N.G., (father) appeals from the juvenile court's order terminating his parental rights following a section 366.26 hearing.  (See § 395.)  He claims that the juvenile court erred in finding that the beneficial parent-child relationship exception to termination of parental rights did not apply.  Father also asserts that social worker's failure to facilitate visits between one-year-old N.G. and him while he was incarcerated in the county jail deprived him of due process.

_____

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

We affirm the juvenile court's order terminating parental rights.

I

*Procedural and Factual History*

A. *Background*

On October 10, 2012, a juvenile dependency petition was filed on behalf of seven-month-old N.G. under section 300, subdivisions (b) (failure to protect), (c) (serious emotional damage), and (j) (abuse of sibling). On October 12, 2012, a first amended dependency petition was filed on N.G.'s behalf under section 300, subdivisions (b) (failure to protect) and (g) (no provision for support).

On November 6, 2012, a second amended petition was filed under section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). It alleged the following facts. N.G. and an older half-sibling, M.G., (the children) had been taken into protective custody pursuant to a warrant on October 10, 2012, because they "were at significant risk of harm in the care of their mother . . . and [N.G.'s] father . . . due to the parents' substance abuse, ongoing domestic violence, and criminal history and the mother's inability to provide appropriate care." On multiple occasions, the children were "exposed to intimate partner violence between the mother and [N.G.'s father] and [between] the mother and her previous partners . . . ." That violence included "physical altercations, screaming at each other, and using foul language." "The children's ongoing and repeated exposure to intimate partner violence places them at substantial risk of serious physical harm and emotional damage in the care of the mother and [N.G.'s father]." "[T]he mother has a substance abuse problem which negatively impacts her ability to parent her children. The mother began using methamphetamines approximately 2 ½ years ago, on a daily basis, including while caring for and/or pregnant with the children. The mother has been unable to secure stable housing and has been unable to separate herself from her violent relationship with [N.G.'s father] and his extended

2

family. The mother's untreated substance abuse problem places the children at risk of harm in her care." Despite mother's participation in family reunification services and family maintenance services in a prior dependency case brought on behalf of M.G., "mother continues to expose the children to violence and substance abuse."

The second amended petition also alleged the following. Approximately three months before the petition was filed, "the mother left both of the children in the care of [N.G.'s father], who has a history of violence and substance abuse, because she was homeless and had nowhere to go." Father is residing with N.G.'s paternal grandmother and paternal aunt, who "have refused to allow the mother into their home to see her children" and, "[a]s a result, the mother breaks into the home in the middle of the night, approximately 4 times a week" "to see [N.G.'s father] and her children." "The mother and the paternal aunt engage in physical and verbal altercations when the mother shows up at their residence, and the children are exposed to and aware of this violence."

The petition further alleged that father has "a substance abuse problem which negatively impacts his ability to parent [N.G.]" and father's "untreated substance abuse problem places [N.G.] at risk of harm in his care." It stated that father has a criminal history and listed multiple convictions, including many drug-related offenses. It alleged that his "drug-related criminal activity places [N.G.] at risk of harm in his care."

On January 25, 2013, the court held a contested jurisdiction and disposition hearing. The court admitted into evidence the "Jurisdiction/Disposition Report," dated November 9, 2012, the "First Addendum Report," dated November 30, 2012, and the "Second Addendum Report," dated December 14, 2012. It found the allegations of the second amended petition true as alleged.

The juvenile court ordered N.G. to continue under the Department's care, custody and control for out-of-home placement with an extended family member. It ordered family reunifications services for N.G. and her parents. The services for father included,

but were not limited to, submitting to random testing at least once a week, obtaining a substance abuse assessment and complying with the drug treatment programs recommended by the assessment, and completing a substance abuse parenting class, a 12-step or approved substance abuse self-help program, and a 52-week batterers' intervention program. The court also ordered supervised visitation at least once a week for each parent. It gave the social worker discretion to select the location and the supervisor of the visits.

The Interim Review Report, dated March 22, 2013, reported that father had been "visiting on a consistent basis, except for one occasion when he arrived late and the visit was cancelled." The social worker found that father's interactions with N.G. to be appropriate during an observed visit on March 7, 2013. Father thought he should not have to complete a 52-week batterers' intervention program because he did not have an issue with domestic violence. He had not yet obtained a substance abuse assessment or begun substance abuse testing.

The "Status Review Report," dated July 26, 2013, for the six-month review hearing recommended that the court terminate the family reunification services. Father had made no effort to drug test. He had attended a drug intervention group most recently on March 6, 2013, but he had not provided any documentation of his continued attendance since that date. The report indicated that, although father had been given the contact information, father had not obtained a substance abuse assessment. Father had not engaged in the majority of his case plan services. As to supervised visitation between father and N.G., the Department's case aide told the social worker that there had been no concerns during visits. Father had missed a visit on May 13, 2013, but he had not called to cancel.

An addendum report, dated September 20, 2013, reiterated the Department's recommendation that the court terminate family reunification services. Since July 26,

4

2013, father had drug tested on only one date, July 30, 2013. Father had returned to a men's drug intervention group as of July 10, 2013, but the social worker had not received documentation that father had continued participating in the group after that date. It was noted that "father, for the most part, plays with and engages his daughter during visits."

On September 20, 2013, the court held a trial management conference.

In an addendum report, dated October 11, 2013, the Department made the same recommendation regarding termination of family reunification services. Father had "not called in to test or tested at all since the date of the last Court hearing" on September 20, 2013. Father had stopped attending the men's drug intervention group. Father had missed two supervised visits with his daughter, N.G., because of his criminal court case. Father had been convicted of three misdemeanors: (1) violation of Vehicle Code section 14601.1, subdivision (a) (driving with a suspended license); (2) violation of Penal Code section 148, subdivision (a)(1) (resisting or obstructing a peace officer); (3) violation of Vehicle Code section 2800.2, subdivision (a) (driving in willful or wanton disregard of safety while fleeing a peace officer). He had been sentenced to serve 180 days in county jail.

On October 11, 2013, after the contested six-month review hearing, the juvenile court terminated family reunification services. It ordered a selection and implementation hearing pursuant to section 366.26 hearing. The court ordered supervised visitation to continue at least once a week for mother and for father. It again conferred discretion upon the social worker to select the location and supervisor of the visits.

On February 14, 2014, the juvenile court held a contested section 366.26 hearing.

B. *Contested Section 366.26 Hearing*

The juvenile court reviewed and admitted into evidence the section 366.26 report, dated January 17, 2014.

5

In the report, social worker Tania Carbajal recommended that the court terminate parental rights and select a permanent plan of adoption for N.G., who was almost two years old, and M.G. Following his recent release from custody, father had begun visiting N.G. again. The prospective adoptive parent had indicated her willingness "to supervise visits for the parents in the future" provided the parents "had made some efforts regarding substance abuse treatment." Carbajal stated in the report that it "appears that the mother and the fathers continue to struggle with the issues that have brought this family to the Court's attention."

Carbajal, who was recognized as an expert in permanency planning for dependent children by the court, testified at the hearing. She had reviewed the visitation service logs. During father's visits with N.G., father and N.G. were affectionate with each other. N.G. "chatter[ed]" and had conversations with father. N.G. normally ran up to father when she saw him. She sometimes called father "daddy" when she saw him. N.G. had not appeared hesitant around father and she played with him. Father had gotten down on the floor to play with her. N.G. had sought out father's attention during visits and brought toys to him for their play. Some of their play was educational. Father had changed her diapers.

Carbajal testified that, for the most part, father had regularly visited with N.G. Although father had no visits with N.G. while he was in custody, he requested visitation when he was released in January 2014 and visits recommenced. Father had failed to show up for approximately four visits without calling to reschedule, including a visit scheduled for January 31, 2014.

In Carbajal's opinion, father had appropriately interacted with N.G. during visits. Father testified that he wanted to keep seeing N.G.

Father had not, however, progressed beyond supervised visits with N.G. because he made insufficient efforts to address the issues that brought the case to the court's attention. When father visits with N.G., a case aide and visitation monitor is in the room.

Carbajal acknowledged that N.G. was a playful child. If she was with someone she knew and there were toys, N.G. played and chatted with the person and played with the toys. She was affectionate with her brother and extended family. N.G.'s relationship with father was playful. The degree of playfulness between N.G. and father was about the same as between N.G. and her cousins or her brother.

Carbajal testified that N.G. does not really have a parent-child relationship with father. She knows him, refers to him as "daddy" when she sees him, and appears to enjoy his visits but father had not provided for her care since she was removed from parental custody and N.G. looks to her current caregiver to meet all her daily wants and needs. In her opinion, based on N.G.'s age and the length of time out of her father's care, it was more important for N.G. to have a permanent home than to have an ongoing relationship with father. In addition, the benefits of a permanent, stable home outweighed the benefits of N.G.'s relationship with father.

It was Carbajal's assessment that N.G. would not suffer detriment or serious harm to her emotional wellbeing if father's parental rights were terminated. N.G. was very bonded to her current caregiver. Given her age and her bond to the caregiver, N.G. would be able to overcome any loss resulting from termination of contact with father.

Father testified he saw N.G. every week. N.G. called him "pa" or "daddy." He believed that his daughter benefitted from seeing him and, on visitation days, she was at the door waiting for him. They talked during visits. But he had not been allowed to go to her doctor's appointments and he had not been invited to participate in her education. He loved N.G. very much. He wanted to continue seeing her.

Father acknowledged that he had gone into custody on November 20, 2013 and he restarted visits around the first week of January 2014. He had not seen N.G. for a period of about six weeks.

At the end of the section 366.26 hearing, the juvenile court found by clear and convincing evidence that it was likely N.G. would be adopted. The court determined that the beneficial parent-child relationship exception to termination of parental rights was not established. The court terminated parental rights and selected a permanent plan of adoption for N.G. It referred her to the county adoption agency for adoptive placement.

II

*Discussion*

A. *Termination of Parental Rights*

"Under section 366.26, the statutory preference is to terminate parental rights and order the child placed for adoption. (§ 366.26, subd. (b)(1).)" (*In re C.B.* (2010) 190 Cal.App.4th 102, 121.) As a general rule, a juvenile court must terminate parental rights and order the child placed for adoption if it determines "by a clear and convincing standard, that it is likely the child will be adopted . . ." after a section 366.26 hearing. (§ 366.26, subd. (c)(1).)

"A few statutory exceptions to this rule permit the juvenile court not to terminate parental rights when compelling reasons show termination would be detrimental to the child. ([§ 366.26], subd. (c)(1)(B)(i)-(vi).)" (*In re K.C.* (2011) 52 Cal.4th 231, 237, 255.) "Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809 [92 Cal.Rptr.2d 20].)" (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) "[I]t is the parent's burden to show exceptional circumstances exist. [Citation.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autum H.*).)

8

Section 366.26 provides an exception to the statutory preference for termination of parental rights and adoption where the juvenile court "finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The phrase "benefit from continuing the [parent-child] relationship" means "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

"In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

On appeal, father is not challenging the juvenile court's finding that it is likely N.G. will be adopted. Rather, he contends he and minor had "a parent-child bond" and they had "an emotionally significant relationship." He asserts that "[t]he evidence was insufficient to support the juvenile court's determination the beneficial relationship exception did not apply . . . ."

This court has concluded that both the substantial evidence and the abuse of discretion standards apply to a review of a juvenile court's determination whether a statutory exception to termination of parental rights applies.[2] (See *In re C.B.* (2010) 190

---

[2] There is a split of opinion as to the proper standard for reviewing a juvenile court's determination whether an exception to termination of parental rights applies. (See e.g., *In re J.C.* (2014) 226 Cal.App.4th 503, 530-531 [Fourth Dist., Div. 3, follows Sixth Dist.]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [Second Dist., Div. 7, follows (continued)

9

Cal.App.4th 102, 123 (*C.B.*); *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) "[T]he substantial evidence test applies to pure findings of fact. [Citations.]" (*C.B.*, *supra*, at p. 123.) "Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental . . . relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination." (*Bailey J.*, *supra*, at p. 1314.)

In contrast, a "juvenile court finding that the relationship is a 'compelling reason' for finding detriment to the child is *based* on the facts but is not primarily a factual issue." (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.) "It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951 . . . .) Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Ibid.*)

" 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Father repeatedly cites *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*). In that case, S.B.'s father had been her "primary caregiver for three years." (*Id.* at p. 298.) "When S.B. was removed from his care, [the father] immediately recognized that his drug

Sixth Dist.]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [First Dist., Div. 3, adopted abuse of discretion standard of review]; *Autumn H.*, *supra*, 27 Cal.App.4th at pp. 576-577 [Fourth Dist., Div. 1, applied substantial evidence test].) As a general rule, in this context, "[t]he practical differences between the two standards of review are not significant." (*In re Jasmine D.*, *supra*, at p. 1351.)

10

use was untenable, started services, maintained his sobriety, sought medical and psychological services, and maintained consistent and regular visitation with S.B. He complied with 'every aspect' of his case plan." (*Ibid*.) A social worker noted that " '[the father] consistently puts his daughter[']s needs and safety before his own.' " (*Ibid*.) "For the first year after she was removed from parental custody, S.B. continued to display a strong attachment to [her father]. She was unhappy when visits ended and tried to leave with [her father] when the visits were over." (*Id*. at p. 298.) There had been a bonding study of the father and S.B., which "concluded that, because the bond between [the father] and S.B. was fairly strong, there was a potential for harm to S.B. were she to lose the parent-child relationship." (*Id*. at pp. 295-296.)

The Court of Appeal deciding *S.B*. (Fourth District, Division 1) concluded that the father "had a continuing beneficial relationship with his daughter within the meaning of the statutory exception to termination of parental rights" and reversed the juvenile court's order terminating parental rights. (*S.B*., *supra*, 164 Cal.App.4th at pp. 293, 303.) The same appellate court subsequently stated in a different case: "The *S.B*. opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*In re Jason J*. (2009) 175 Cal.App.4th 922, 937.)

In this case, unlike *S.B*., there was no bonding study and no expert testifying that there was a potential for detriment to N.G. from the loss of her relationship with father. To the contrary, the social worker, testifying as an expert, indicated that N.G. would not suffer detriment or serious emotional harm from the termination of father's parental rights.

"The [beneficial parent-child relationship] exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child

11

bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-576.)

The record does not reflect that the court found father had not maintained regular visitation and contact with N.G. or they did not have a positive, beneficial relationship to some degree. Rather, it appears that the court impliedly found that father's relationship with N.G. did not constitute "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) We discern no abuse of discretion.

N.G. had been out of father's care for most of her life. She was almost two years old at the time of section 366.26 hearing. Father behaved appropriately during visitation but he had never progressed beyond supervised visitation and, unlike the father in *S.B.*, he had not complied with his case plan. He and N.G. had an affectionate, playful relationship. While their interactions were pleasant, there was no evidence that N.G. had any special needs that could be met by only father. There was no evidence that N.G. was upset when the visits ended. As indicated, it was the opinion of the social worker, who testified as an expert, that the benefits of a permanent, stable home that would be afforded N.G. through adoption outweighed the benefits of an ongoing relationship with father.

The juvenile court could reasonably conclude that the benefits of adoption with respect to N.G.'s wellbeing significantly outweighed the benefit of a father-daughter relationship and termination of that parental relationship would not result in any significant harm to N.G. (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The court did not abuse its discretion in finding the beneficial parent-child relationship exception inapplicable and terminating father's parental rights.

12

B.  *Visitation*

Father asserts that "denial of visitation" while he was in jail for approximately six weeks "violated [his] due process right."  He claims that "the unsanctioned denial of visitation" by social worker Carbajal while he was in custody "fatally impaired [his] ability to maintain his ongoing bond with his daughter and therefore establish the applicability of the parent-child relationship exception to adoption."  He argues that "Carbajal usurped the role of the juvenile court thereby depriving [him] of his right to visit his child with the consequence that, in the eyes of the court, he could not show a bond with his child."

Father points to social worker Carbajal's testimony at the section 366.26 hearing.  She testified that, before father went into custody, Carbajal asked him to let her know whether he was able to participate in the PACT program, which impliedly would have facilitated visitation.  It had been expected that father would be in custody for three months but he was released much sooner.  Carbajal explained that she "did not make arrangements to transport the child N.G. for a window visit, because [she] thought it would be very difficult for a child so young to have a window visit."  She stated that father was "provided a visit almost immediately upon contacting [her] office after his release."

Father also refers us to the court's comments concerning the gap in his visitation while he was in custody:  "The 6-week gap in visits . . . while you were incarcerated is an interesting fact to the court.  Your attorney says, . . . you didn't get window visits and that wasn't really your fault, but the court fails to see how you could have stood in a parental role with a window visit, so I don't see that as a significant issue here.  What I see is that you absented yourself for 6 weeks in a very important time when your counsel wanted to make an argument about how significant your attachment is to your child.  6 weeks in the life of a 2-year-old is a long time."

13

In our view, father has forfeited his due process contention by not raising it below. "Dependency matters are not exempt from [the forfeiture] rule. (See, e.g., *In re Dakota S.* (2000) 85 Cal.App.4th 494, 502 [102 Cal.Rptr.2d 196] [failure to obtain supervising agency's assessment of prospective guardian under § 366.22, subd. (b)]; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338-1339 [63 Cal.Rptr.2d 562] [failure to request court to order bonding study]; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885-886 [48 Cal.Rptr.2d 763] [failure to challenge setting of § 366.26 permanency planning hearing when court determined that no reasonable reunification efforts were made].)" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. (*People v. Saunders* (1993) 5 Cal.4th 580, 589-590 [20 Cal.Rptr.2d 638, 853 P.2d 1093].) The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. (*Saunders*, at p. 590.)" (*Ibid.*, fn. omitted.)

In any case, the claim must be rejected on its merits. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." "The touchstone of due process is protection of the individual against arbitrary action of government . . . [citation]." (*Wolff v. McDonnell* (1974) 418 U.S. 539, 558 [94 S.Ct. 2963].) "[T]he Due Process Clause was intended to prevent government officials ' " 'from abusing [their] power, or employing it as an instrument of oppression.' " ' [Citation.]" (*County of Sacramento v. Lewis* (1998) 523 U.S. 833, 846 [118 S.Ct. 1708].)

"[The United States Supreme Court has] long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.' *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S.Ct. 2258 (1997). The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'

14

*Id.*, at 720, 117 S.Ct. 2258; see also *Reno v. Flores*, 507 U.S. 292, 301-302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)." (*Troxel v. Granville* (2000) 530 U.S. 57, 65 [120 S.Ct. 2054].) The substantive component "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.' *Daniels v. Williams*, 474 U.S., at 331, 106 S.Ct., at 664." (*Zinermon v. Burch* (1990) 494 U.S. 113, 125 [110 S.Ct. 975].)

"[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." (*Troxel v. Granville*, *supra*, 530 U.S. at p. 65.) "Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. [Citations.] The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. [Citations.] This interest is a compelling one. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

Father is essentially claiming that social worker Carbajal deprived him of due process by failing to facilitate visits with N.G. at the window while he was in jail. We are not persuaded.

The record does not show that the social worker acted unreasonably in determining that, given N.G.'s very young age, it would be "very difficult" for N.G. to have a window visit with father and visitation impliedly should not take place there.[3]

---

3    Parental visitation must be consistent with the well-being of the dependent child. (See § 362.1, subd. (a)(1)(A).)

15

She apparently believed that visitation might be facilitated through the PACT program while father was in jail. Visitation resumed soon after father's release from jail.

The United States Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government,' [citation], whether the fault lies in a denial of fundamental procedural fairness, [citation], or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, [citation]." (*County of Sacramento v. Lewis*, *supra*, 523 U.S. at pp. 845-846.) "[The court's] cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,' [citation] . . . ." (*Id*. at p. 846.) "[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.' " (*Id*. at p. 847.) Father has not made any such showing here.

*In re David D*. (1994) 28 Cal.App.4th 941 (*David D*.), which father cites, is both factually and legally distinguishable. The principle issue in that case was whether adequate family reunification services, particularly visitation, had been provided. (*Id*. at p. 943.) During the reunification period, a referee had suspended mother's visitation until she provided medical and psychiatric records. (*Id*. at p. 945.) The referee had also suspended telephone contact between the mother and her children. (*Ibid*.) The referee terminated family reunification services, set the section 366.26 hearing "nearly four months" later, and allowed mother only a single visit during that period. (*David D*., *supra*, at pp. 949, 955, fn. 10.) Even with the gaps in visitation, there was "overwhelming evidence of the minors' bond with their mother." (*Id*. at p. 955.)

The appellate court in *David D*. determined that "inadequate reunification services were provided to this family, and also conclude[d] the juvenile court erroneously denied

regular visitation between this mother and her children after terminating reunification services, thus both violating the statutory directive and depriving the mother of the opportunity to come within the exception to adoptive placement expressly permitted when a parent has maintained a regular visitation schedule." (*David D*., *supra*, 28 Cal.App.4th at p. 943.) It concluded that, "[u]nder the circumstances of this case, an additional six months of reunification services are warranted, during which [mother] must be provided an opportunity to reestablish regular visitation with the minors. [Citation.]" (*Id*. at p. 956.)

In this case, in contrast, the juvenile court consistently mandated a minimum number of visits.[4] Father's reliance upon *David D*. is misplaced because father is not claiming that reasonable family reunification services were not offered or provided to him. (See § 366.26, subd. (c)(2)(A) ["The court shall not terminate parental rights if . . . [a]t each hearing at which the court was required to consider reasonable efforts or services, the court has found that reasonable efforts were not made or that reasonable services were not offered or provided."].) *David D*. was not a due process case.

In this case, unlike *David D*., the court's visitation orders prior to the section 366.26 hearing did not prevent father from bringing himself within the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)). Father did not timely

---

[4]    To the extent father implies that any juvenile court order regarding visitation was improper, we reject the contention. The court did not improperly delegate the authority to decide whether to grant visitation to the Department. (See *In re Christopher H*. (1996) 50 Cal.App.4th 1001, 1008-1009.) It properly authorized the social worker to determine the location of father's visits. (See *In re S.H*. (2003) 111 Cal.App.4th 310, 317 ["the child's social worker may be given responsibility to manage the actual details of the visits, including the power to determine the time, place and manner in which visits should occur. [Citation.]"].) The juvenile court was *not* required to make findings of detriment since it did not discontinue visitation upon terminating family reunification services and setting the matter for a section 366.26 hearing. (See § 366.21, subd. (h) ["The court shall continue to permit the parent . . . to visit the child pending the [section 366.26] hearing unless it finds that visitation would be detrimental to the child"].)

17

challenge the Department's implementation of the court's order by seeking modification of the order on grounds of changed circumstances (see § 388).

Father asserts that "[i]t was error for the court to sanction the department's unauthorized exercise of a judicial function with the resulting negative impact on Father's parental rights." We do not read the court's remarks as ratifying the social worker's determination that the jail's visitor window was not an appropriate location for visiting with N.G. Rather, we understand the court's statements as a rebuke for father's criminal conduct that resulted in his incarceration and interfered with meaningful visitation. The court clearly did not think six weeks of window visits would have made any difference in this case.

Father has failed to show that he was denied due process of the law.

DISPOSITION

The juvenile court's order terminating parental rights is affirmed

_____
ELIA, J.

WE CONCUR:


_____
RUSHING, P. J.


_____
PREMO, J.

19